UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL GIER,

                            Plaintiff,                  Civil Action No.: 15-12792
                                                Honorable Victoria A. Roberts
                      v.                        Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                            Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [18, 22]

      Plaintiff Michael Gier ("Gier") brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").  Both parties have filed summary judgment motions [18, 22] and replies [23, 24], which have been referred to this Court for a Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

      For the reasons set forth below, the Court finds that substantial evidence supports the ALJ's decision that Gier was not disabled between August 19, 2007 and December 31, 2008. Accordingly, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [22] be GRANTED, Gier's motion [18] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

## II.    REPORT[1]

### A.    Procedural History

This case's procedural history is relatively complicated.  On April 24, 2008, Gier filed an application for DIB, alleging a disability onset date of July 11, 2000.[2]  (Tr. 238-44).  The claim was denied initially on May 22, 2008.  (Tr. 71).  Thereafter, Gier filed a timely request for an administrative hearing, which was held on April 7, 2010, before ALJ Mary Ann Poulose.  (Tr. 10-35).  Gier, represented by attorney Thomas Bertino, testified, as did a vocational expert ("VE").  (Id.).  At the hearing, Gier and his counsel acknowledged that Gier's potential entitlement to benefits would be limited to the time period between ALJ Sasena's decision on August 18, 2007 and December 31, 2008, his date last insured.  (Tr. 13).

On May 7, 2010, ALJ Poulose found Gier not disabled through his date last insured.  (Tr. 72-88).  While noting that ALJ Sasena had decided in August 2007 that Gier was no longer

---

[1] Much of the procedural history and background sections have been taken from this Court's earlier R&R, issued on July 29, 2014.  (Tr. 691-726).  The citations have been updated to reference the current transcript.

[2] Prior to filing this DIB application, on April 18, 2001, Gier had been found disabled as of July 11, 2000.  (Tr. 39, 692).  However, pursuant to continuing disability review, on November 14, 2003, it was determined that Gier was no longer disabled as of November 1, 2003.  (Tr. 62, 692); see 20 C.F.R. § 404.1589.  This determination was upheld upon reconsideration, and Gier requested a hearing, which was held before ALJ Richard Sasena on March 22, 2007.  (Id.).  Gier and his mother testified at the hearing, and he waived representation.  (Id.).  In a decision dated August 18, 2007, ALJ Sasena found that Gier's disability had ceased as of November 1, 2003, due to medical improvement and that he was not otherwise disabled through the date of the decision.  (Tr. 59-70).  ALJ Sasena considered Gier's original alleged disabling condition, his status post left hip arthroplasty, as well as additional conditions alleged after that date, including degenerative joint disease, degenerative disc disease, rotator cuff tear, generalized anxiety disorder, and an adjustment disorder.  (Tr. 64).  Gier appealed this decision, and the Appeals Council denied review.  (Tr. 39, 692).  Gier then appealed this decision to the United States District Court for the Eastern District of Michigan.  (Id.).  On March 26, 2009, the Honorable Victoria A. Roberts affirmed the ALJ's decision, making it the final decision of the Commissioner and binding on all parties.  (Tr. 680-89); 20 C.F.R. § 404.955.  In short, it was conclusively established that Gier's period of disability ceased as of November 1, 2003.

entitled to benefits as of November 1, 2003, ALJ Poulose did not conduct a specific *res judicata* analysis regarding this decision.  (*Id.*).  Nor did she mention that the prior decision had considered Gier's conditions between November 1, 2003 and August 18, 2007, or that it was upheld on appeal by the District Court.  (*Id.*).  On May 16, 2011, the Appeals Council remanded the case for further review by the ALJ.  (Tr. 89-93).  In its decision, the Appeals Council noted that the ALJ had not conducted a *res judicata* analysis for the time period in which Gier received benefits and concluded that *res judicata* did apply to that time period.  (Tr. 91).  The Appeals Council did not conduct a *res judicata* analysis for the time period between November 1, 2003 and August 18, 2007.  And, like the ALJ, the Appeals Council did not address the fact that ALJ Sasena's August 18, 2007 decision had considered Gier's conditions between November 1, 2003 and the date of the decision, nor that the District Court had upheld that decision on appeal.  (*Id.*). Instead, the Appeals Council found that ALJ Poulose erred in not considering the opinion of Gier's treating physician and in not adequately assessing his credibility and therefore remanded the case for consideration of Gier's condition since November 1, 2003.  (Tr. 91-92).

The case was assigned on remand to ALJ Jeanne VanderHeide, who held two hearings, one on August 4, 2011 (Tr. 602-13), and a second on February 13, 2012.  (Tr. 568-601).  Gier appeared at both hearings but, upon the advice of his attorney, did not testify.  (Tr. 589-90, 607-12).  A VE also appeared at the hearings and answered questions both by interrogatory and in person.  (Tr. 365-72, 387, 591-600).  On March 20, 2012, ALJ VanderHeide found Gier not disabled at any time through December 31, 2008, his date last insured.  (Tr. 36-58).  While disagreeing with the Appeals Council's decision and opining that *res judicata* did, in fact, apply to Gier's claim through August 18, 2007, ALJ VanderHeide nevertheless evaluated the body of medical evidence and rendered a negative decision on Gier's claims of disability from November

1, 2003 through December 31, 2008, as instructed by the Appeals Council. (*Id.*). On March 5, 2013, the Appeals Council denied review. (Tr. 1-6). Gier filed for judicial review of this final decision on April 15, 2013. (Case No. 13-11684, Doc. #1).

On July 29, 2014, the undersigned issued an R&R in which it found that *res judicata* applied to the period of alleged disability from November 1, 2003 through August 18, 2007, and that ALJ VanderHeide's decision that Gier was not disabled between August 19, 2007 and December 31, 2008 was supported by substantial evidence. (Tr. 691-726). The undersigned recommended granting the Commissioner's Motion for Summary Judgment, denying Gier's Motion for Summary Judgment, and affirming the ALJ's decision. (*Id.*). On August 11, 2014, Gier filed twelve objections to the R&R, which the Commissioner did not respond to. (Tr. 682).

On September 30, 2014, District Judge Victoria A. Roberts sustained Gier's fourth and fifth objections regarding ALJ VanderHeide's failure to find a severe mental impairment at Step Two. (Tr. 680-689). Judge Roberts reversed the Commissioner's decision on this issue and remanded the matter for ALJ VanderHeide to clarify the combined effect of all of Gier's impairments on his ability to work between August 19, 2007 and December 31, 2008. (Tr. 677-79, 682, 688). Judge Roberts held that *res judicata* applied, so ALJ VanderHeide was required on remand to adopt ALJ Sasena's previous finding at Step Two that Gier had severe mental impairments. (Tr. 683-86).

On May 5, 2015, ALJ VanderHeide held another administrative hearing. (Tr. 639-76). Gier chose to rely on his previous testimony and did not attend the hearing. (Tr. 642). A VE, however, did appear and testify. (Tr. 646-76). On June 4, 2015, ALJ VanderHeide found Gier not disabled between August 19, 2007 and December 31, 2008, his date last insured. (Tr. 617-38). Gier did not file objections to this decision, and the Appeals Council did not review it on its

4

own.  (Tr. 615).  The ALJ's decision became final sixty-one days later, on August 5, 2015.  (*Id.*).

Gier then filed for judicial review of the final decision on August 7, 2015.  (Doc. #1).

### B.      Framework for Disability Determinations

Under the Act, DIB are available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a
> severe impairment that is expected to last for at least twelve months, and the
> severe impairment meets or equals one of the impairments listed in the
> regulations, the claimant is conclusively presumed to be disabled regardless of
> age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work,
> benefits are denied without further analysis.
>
> Step Five:  Even if claimant is unable to perform his or her past relevant work, if
> other work exists in the national economy that plaintiff can perform, in view of
> his or her age, education, and work experience, benefits are denied.

*Schueneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec.

6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four

steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C. Background

#### 1. *Gier's Subjective Reports and Testimony*[3]

Gier was 50 years old at the time of his application for benefits. (Tr. 293). He reported being 6'2" tall, weighing 225 pounds, and having a college education. (Tr. 297, 304). He reported that the conditions preventing him from working were degenerative spine and back, osteoporosis, back cancer, depression, right and left hip problems, right knee problems, broken tailbone, left and right torn rotator cuff, and anxiety. (Tr. 298). He reported that he became unable to work on July 11, 2000 due to these conditions and an injury he suffered at work. (*Id.*). He previously worked as a sales manager for automotive parts, which involved making telephone calls, traveling, selling, providing customer service, and building customer relations. (Tr. 299). He has not worked since leaving this job in 2000. (Tr. 298). In an Appeals Report, Gier indicated that his conditions worsened in 2004. (Tr. 332). Specifically, he reported having a stomach ulcer, high blood pressure, heartburn, hip failure, and a cracked molar requiring a bone graft and implant. (Tr. 332-34). He also reported "more anxiety, depression and isolation, due to this battle with SSI." (Tr. 341).

Gier reported being treated by several doctors for his conditions and taking Proscar (for his enlarged prostate) and Valium (for anxiety). (Tr. 300-303). Gier alleged no side effects from either medication. (Tr. 303). However, in an Appeals Report, he listed fatigue, lightheadedness,

---

[3] As discussed above, Gier elected not to testify at the three most recent administrative hearings in this matter. *See supra* at 3-4. The testimony cited below is from the last time Gier testified – at the April 7, 2010 hearing before ALJ Poulose.

and difficulty staying focused.  (Tr. 336).  He also listed fatigue as a side effect from the other medicines he reported taking, including Vicodin (for pain); Amoxicillin (to fight infection); Ibuprofen, Naproxen, and Glucosamine (for pain and inflammation); Cantron (for cancer); and Hyzaar and Lisinopril (for high blood pressure).  (Tr. 22, 336).  He reported taking Aleve and naproxen sodium in its generic form, rather than prescription strength, on his doctor's recommendation and due to a lack of insurance.  (Tr. 22).  He also reported taking Lipitor and a number of supplements.  (Tr. 22-23, 345).

Gier reported that his day consists of hanging upside down or lying on an inversion table; doing light therapy three times a day for depression; and getting treatment from an electromagnetic spectrum lamp for his neck, back, hips, knees and shoulders.  (Tr. 20, 314).  He takes up to three baths a day, applies heat and ice packs one to three times a day, and engages in exercise therapy (including riding a stationary bike, lifting light weights, and exercising with rubber bands) in lieu of physical therapy because he does not have the insurance to pay for it.  (Tr. 23, 316).  He reported attending individual and group therapy sessions for anxiety and depression, praying, meditating, and listening to relaxation and therapy tapes at home.  (Tr. 316).

Gier can take care of his personal needs, such as bathing, getting dressed, and shaving.  (Tr. 17, 315).  His mother goes grocery shopping and prepares meals for him, and when he is not exercising or in therapy, he spends his day eating, reading the paper and the mail, and watching television.  (Tr. 17, 315-16, 319).  He usually takes a one-hour nap, and sometimes another one in the evening as a result of fatigue from his medications and his inability to sleep well at night.  (Tr. 314-15).  He puts dishes in the dishwasher and does his own laundry, but his mother helps him clean because he does not dust or vacuum.  (Tr. 17, 317).  He either hires a service or his neighbors help him mow the lawn and shovel snow.  (Tr. 17).  He goes outside every couple of

days and can drive and go out alone, but does not drive often due to his conditions, including a broken tailbone. (Tr. 17, 318). He can shop, but does so mostly by phone and mail, and he only shops in stores to get his medicine. (Tr. 318). He denied engaging in outside activities or socializing with friends, and he reported being isolated and having difficulties with relationships due to his anxiety and depression. (Tr. 18, 319-20).

Gier reported that his conditions affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow directions, use his hands, and get along with others.[4] (Tr. 320). He has trouble remembering and focusing and keeps lists around the house to remember things. (Tr. 25-26). He sometimes stays in bed due to depression and often cries for no reason. (Tr. 26). He can only walk short distances before needing to rest and does not follow instructions well. (Tr. 320). He cannot lift more than about ten pounds, and he can sit for only ten to twenty minutes at a time. (Tr. 19-20). His most comfortable position is reclining. (Tr. 19). He denied ever losing a job due to problems getting along with others. (Tr. 321). He also reported not handling stress or changes well. (*Id.*). He reported attempting suicide in 2006 or 2007. (Tr. 24, 322).

### 2.   *Medical Evidence*

The Court has thoroughly reviewed Gier's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### D.   **The ALJ's Findings**

On remand, ALJ VanderHeide found Gier not disabled, following the five step sequential

---

[4] At his initial application interview on April 24, 2008, Gier was found to be polite and to have no difficulties with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering questions, sitting, standing, walking, seeing, using his hands, and writing. (Tr. 295).

analysis.  (Tr. 614-637).  Prior to beginning this analysis, she stated as follows:

> This case is again before the undersigned on remand from the Appeals
> Council pursuant to a remand from the United States District Court . . . .
> Pursuant to Judge Roberts' Order, which adopted the remaining portions
> of the [R&R], the undersigned is limited to [a] review of whether [Gier]
> was entitled to benefits between August 19, 2007, and December 31, 2008
> . . . .

(Tr. 618).  She then proceeded with the sequential analysis.

At Step One, the ALJ found that Gier had not engaged in substantial gainful employment from August 19, 2007, through December 31, 2008, his date last insured.  (Tr. 620).  At Step Two, she found that Gier had the following severe impairments:  status post left hip arthroplasty, degenerative joint disease, degenerative disc disease, rotator cuff tear, generalized anxiety disorder, and adjustment disorder.  (Tr. 620-21).

At Step Three, the ALJ concluded that none of Gier's impairments, either alone or in combination, met or medically equaled a listed impairment.  (Tr. 621-23).  The ALJ next assessed Gier's residual functional capacity ("RFC"), finding him capable of light work with the following additional limitations:  pushing or pulling up to the weight limits only when seated; no climbing ladders, ropes, or scaffolds; occasional climbing of ramps or stairs, stooping, crouching, kneeling, and crawling; requiring a handheld assistive device for uneven terrain or prolonged ambulation; avoiding direct use of moving machinery and all exposure to unprotected heights; and requiring a sit/stand option, sitting or standing alternatively at will, provided that he was not off task for more than ten percent of the workday and not sitting or standing more than twenty minutes at one time.[5]  (Tr. 623-628).

---

[5] The ALJ explained that she found that there had been some changes in Gier's physical condition following ALJ Sasena's August 18, 2007 decision, and that substantial evidence in the record therefore supported changing his RFC from the RFC ALJ Sasena had previously determined for him.  (Tr. 618).

At Step Four, the ALJ found that Gier could not perform any of his past relevant work. (Tr. 628). At Step Five, she concluded that based on Gier's age, education, vocational background, and RFC, coupled with the VE's testimony, there were a significant number of other jobs in the national economy that he could perform and thus he was not disabled between August 19, 2007 and December 31, 2008. (Tr. 629-30). These light, unskilled jobs included: packer (3,000 jobs in southeast Michigan; 150,000 jobs nationally), sorter (2,500 jobs in southeast Michigan; 100,000 jobs nationally), and small products assembler (5,000 jobs in southeast Michigan; 125,000 jobs nationally). (Tr. 629).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide

10

questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

In his motion for summary judgment, Gier argues that the record does not support: (1) the ALJ's finding of only mild limitations resulting from his generalized anxiety disorder and adjustment disorder, which at Step Two were considered "severe" impairments; and (2) the ALJ's determination of an RFC for light work. Each of these arguments is addressed below.[6]

---

[6] Gier's motion also contains a two-line subheading asserting that the ALJ did not properly

1.   *Substantial Evidence Supports the ALJ's Finding that Gier's Anxiety Disorder and Adjustment Disorder caused Mild Limitations*

Gier argues that the record "does not support a finding that [he] had mild limitations from his severe anxiety disorder and adjustment disorder."  (Doc. #18 at 24).  He also argues that a finding of a severe impairment is inconsistent with the ALJ's conclusion that Gier had mild functional limitations, and that the ALJ erred in not including a specific mental limitation in his RFC.  (*Id.* at 22-23).  These arguments lack merit.

The Court first addresses Gier's argument that the ALJ's decision was inconsistent in finding his anxiety and adjustment disorders to be "severe" impairments at Step Two, but then later finding that they resulted in only "mild" limitations.  (*Id.*).  This argument lacks merit as it fails to recognize the significant differences in the analysis applicable to Step Two as opposed to other steps in the sequential evaluation process.  The Step Two severity determination is "a *de minimis* hurdle," requiring the claimant merely to show that a particular impairment more than minimally impacts her ability to perform work-related functions.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "Thus, an individual can have a severe impairment, i.e., one that more than minimally affects work ability, and still retain the RFC to do a wide variety of work."  *Simpson v. Comm'r of Soc. Sec.*, No. 13-640, 2014 WL 3845951, at *9 (S.D. Ohio Aug. 5, 2014).  "A claimant's severe impairment may or may not affect his or her functional capacity to do work.  One does not necessarily establish the other."  *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx.

---

assess his credibility, pain, limitations, and abilities.  (Doc. #18 at 24).  But Gier does not elaborate on this argument, and the Court therefore need not address it.  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal quotations omitted).  At any rate, as discussed below, in the one issue raised by Gier that implicates the ALJ's credibility analysis, her reasoning is supported by substantial evidence.  *See infra* at 26-28.

425, 429 (6th Cir. 2007) (quoting *Yang v. Comm'r of Soc. Sec.*, No. 00-10446, 2004 WL 1765480, at *5 (E.D. Mich. July 14, 2004)). "Put another way, the existence of a severe impairment says nothing as to its limiting effects." *Simpson*, 2014 WL 3845951, at *9 (citing *Higgs*, 880 F.2d at 863). *See also Thomas v. Astrue*, No. 10-1777, 2011 WL 4496533, at *5 (N.D. Ohio Sept. 27, 2011) ("Given the very broad definition of what constitutes a severe impairment at Step Two, it is not *per se* inconsistent for a severe impairment to result in relatively minor work restrictions.").

With these principles in mind, the Court turns to Gier's argument that the record "does not support a finding that [he] had mild limitations from his severe anxiety disorder and adjustment disorder." (Doc. #18 at 24). As laid out above, at Step Two of the ALJ's five-step sequential analysis, the ALJ must determine whether the claimant has a severe impairment or impairments. *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88 (6th Cir. 1985). A severe impairment "is defined in the negative" under 20 C.F.R. § 404.1521, which states that a non-severe impairment is one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities," such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; seeing, hearing, and speaking; using judgment; responding appropriately to supervision, co-workers, and "usual" work situations; and dealing with changes in a "routine" work setting. *Id.* While a finding of a non-severe impairment leads to a finding that the claimant is not disabled, "[i]f a severe impairment is found, then the ALJ compares the claimant's impairment against those listed in Appendix 1, 20 C.F.R. Subpart P, to see if, on the medical evidence alone, the claimant can be found to be disabled." *Id.* at 88-89; *see* 20 C.F.R. § 404.1520a.

The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations,

13

describes impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."   20 C.F.R. § 404.1525(a).   In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled.   *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).   "A claimant must satisfy all of the criteria to meet the listing," *Rabbers*, 582 F.3d at 653, and all of these criteria must be met concurrently for a period of at least twelve continuous months.   *See* 20 C.F.R. §§ 404.1509, 404.1525(c)(3)-(4); 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(D) ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); *see Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.   An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").   On the other hand, if the claimant's "severe" impairment does not meet or medically equal a particular listing, the ALJ determines an RFC for the claimant.   *Farris*, 773 F.2d at 89; *see* 20 C.F.R. § 404.1520a(d)(3).

In this case, the ALJ found at Step Two that Gier's mental impairments – generalized anxiety disorder and adjustment disorder – were severe.   In her decision, the ALJ correctly stated that she was bound by *res judicata* to adopt this finding.[7]   (Tr. 66, 622, 685).   Specifically, the

---

[7] *Res judicata*, which bars the relitigation of the same claim or cause of action, has been "commonly applied" to social security cases, binding both claimants and the Commissioner. *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 840-41 (6th Cir. 1997).   In *Drummond*, the

ALJ explained that

> pursuant to Acquiescence Ruling 98-4(6), adjudicators must adopt a
> finding required at a step in the sequential evaluation process and made by
> an [ALJ] or the Appeals Council in a final decision on a prior claim.
> Thus, [the ALJ] is bound by the Step 2 and Step 3 findings from ALJ
> Sasena's decision, where he found severe impairments of generalized
> anxiety disorder and adjustment disorder at Step 2 but found "only mild
> functional restrictions" with regard to the claimant's mental impairments
> . . . . As there is no new and material evidence relating to such a finding,
> [the ALJ] adopts ALJ Sasena's prior findings in this regard.

(Tr. 622).

In adopting ALJ Sasena's earlier finding of severe mental limitations, the ALJ conducted

a proper Step Two analysis and went on to determine, at Step Three, whether the severity of

these impairments meets or medically equals that of a listed mental disorder, namely, Listing

12.04, which covers affective disorders, and Listing 12.06, which addresses anxiety-related

disorders.   (Tr. 621-23); 20 C.F.R. § 404.1520a(d)(2); 20 C.F.R. § Pt. 404, Subpt. P, App. 1,

Listings 12.04, 12.06.  An impairment qualifies as an affective disorder under Listing 12.04 if it

either meets the criteria in (1) paragraphs A and B; or (2) paragraph C.  20 C.F.R. § Pt. 404,

Subpt. P, App. 1, Listing 12.04.   Meanwhile, an impairment qualifies as an anxiety-related

disorder under Listing 12.06 if it either meets the criteria in (1) paragraphs A and B; or (2)

---

Sixth Circuit held that "[a]bsent evidence of an improvement in a claimant's condition, a
subsequent ALJ is bound by the findings of a previous ALJ."  *Id.* at 842.  The Social Security
Administration applies *Drummond* "only to a finding of a claimant's [RFC] or other finding
required at a step in the sequential evaluation process for determining disability . . . made in a
final decision by an ALJ or the Appeals Council on a prior disability claim."  *Acquiescence Rul.
98-4(6)*, 1998 WL 283902, at *3 (June 1, 1998).   But subsidiary findings, such as those
pertaining to a claimant's credibility, do "not constitute a finding that is required at a step in the
sequential evaluation process for determining disability."  *Id.* n.5.

In her September 30, 2014 decision, Judge Roberts found that "there was insufficient evidence to
justify a departure from ALJ Sasena's finding that Gier had a severe mental impairment" and
"[t]herefore, the principles of *res judicata* apply and ALJ VanderHeide is bound by ALJ
Sasena's earlier finding."  (Tr. 66, 683-85).  However, Judge Roberts ruled that *res judicata* did
not apply to ALJ Sasena's findings regarding Gier's functional limitations.  (Tr. 686).

paragraphs A and C.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.06.

Here, substantial evidence supports the ALJ's finding that Gier's mental impairments did not meet Listing 12.04 and 12.06's paragraphs B or C.  (Tr. 621-23).  To meet paragraph B, which is the same for both listings, the mental impairment must result "in at least two of the following:  1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listings 12.04, 12.06.  The ALJ concluded that Gier had mild restriction in his activities of daily living because at "the March 22, 2007, hearing, [he] . . . testified to taking care of his personal needs and washing some dishes."[8]  (Tr. 621).  In addition, the ALJ explained that Gier indicated in his May 5, 2008 Function Report that he reheated prepared meals, shopped by phone or mail, used the computer, drove, rode in a car, did light exercises, read, watched television, prayed, meditated, spent time with his mother, and was able to handle money.  (*Id.*).

The ALJ concluded that Gier had mild restriction in maintaining social functioning because the April 24, 2008 Field Office Disability Report indicated that Gier was polite and had no trouble answering questions.  (Tr. 295).  His Function Report indicated that he talked on the phone, received rides from other people, spent time with his mother, attended doctor's appointments, and never lost a job because of problems getting along with others.  (Tr. 621-22).

---

[8] Although the ALJ referenced the "March 22, 2007" hearing, the transcript from that hearing is not part of the "transcript of proceedings" in the instant action, *i.e.*, Docket #13.  However, Gier did not assert that the reference is in any way inaccurate.  And the March 22, 2007 transcript, which can be found as part of the record in Case No. 08-11745, Doc. #8-5, Tr. 210-11, does reflect Gier testifying at that time that he was "able to take care of all [his] personal needs like grooming, dressing and bathing" and that he washes "an occasional dish or so . . . . "  Moreover, as discussed above, *supra* at 7, Gier testified at the April 7, 2010 hearing that he takes care of all his own personal needs and does the dishes.  (Tr. 317).

The ALJ concluded that Gier had mild difficulties in maintaining concentration, persistence, or pace because the Field Office Disability Report "reflect[ed] no perceived difficulties in concentrating or understanding" and his Function Report indicated that he drove, used a computer, handled his finances "without difficulty," read, watched television, prayed, and meditated.  (Tr. 622).  In addition, the ALJ pointed out that medical records from March 2008 described Gier as oriented times three with a normal mood.  (*Id.*).

Finally, the ALJ concluded that Gier did not experience episodes of decompensation of extended duration because no evidence in the record indicated otherwise.[9]  (*Id.*).  Thus, the ALJ concluded that Gier's mental impairments did not meet paragraph B of Listing 12.04 and 12.06 between August 19, 2007 and December 31, 2008.  (*Id.*).

To meet Listing 12.04's paragraph C, the affective disorder must have a

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the

---

[9] Following this four-factor analysis, the ALJ recognized that "[r]ecent SSA guidelines indicate that there must be at least 'moderate' limitation in at least one of the aforementioned 'paragraph B' criteria for an impairment to be considered severe."  (Tr. 622).  But she explained that despite her finding of mild limitations, Acquiescence Ruling 98-4(6) bound her to ALJ Sasena's previous finding that Gier had severe mental impairments because there was "no new and material evidence" as to this issue.  (*Id.*).

Moreover, a finding of a "mild" limitation does not automatically lead to a finding of a non-severe impairment; a mild limitation "*generally*" leads to a conclusion that an impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities."  20 C.F.R. § 404.1520(d)(1) (emphasis added).  ALJ Sasena previously determined that the medical evidence supported a finding of severe mental impairments.  (Tr. 66).  As explained above, absent evidence of improvement in Gier's condition, the ALJ was required to adopt this finding regarding his mental impairments.

> environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.04.   Meanwhile, under Listing 12.06's paragraph C, the anxiety-related disorder has to result "in complete inability to function independently outside the area of one's home."   20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 12.06.   The ALJ considered all of these paragraph C requirements and properly found that Gier did not meet any of them.   (Tr. 622).   As to Listing 12.04, the ALJ concluded that Gier

> did not have a medically documented history of a chronic affective disorder of at least 2 years' duration that caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs attenuated by medication or psychosocial support, and one of the following:   repeated episodes of decompensation, each of extended duration; or a residual disease process that resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate; or history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

(*Id.*).   With respect to Listing 12.06, the ALJ concluded that Gier "did not have any anxiety that resulted in complete inability to function independently outside the area of the home."   (*Id.*).   Thus, the ALJ properly concluded that Gier's mental impairments did not meet Listing 12.04 and 12.06's paragraph C between August 19, 2007 and December 31, 2008.   (*Id.*).   After finding that Gier's mental impairments did not meet or medically equal Listings 12.04 and 12.06, the ALJ correctly went on to assess his RFC.   (Tr. 623-28); 20 C.F.R. § 404.1520a(d)(3).

Substantial evidence supports the ALJ's Step Three finding that Gier's mental impairments caused mild functional limitations between August 19, 2007 and December 31, 2008.   Regarding Gier's activities of daily living, Gier indicated in his Function Report that he

lives in a house by himself and is able (without reminders) to take care of his personal needs, for example, dressing himself, bathing, shaving every couple of days, and reheating meals. (Tr. 314-15, 317). He testified that he can walk short distances, though he regularly uses a cane, brace or splint, and shoe lifts – all of which were prescribed by a doctor. (Tr. 320-21).

On a typical day, Gier does a variety of exercises and therapies at his house on his own. (Tr. 314, 316, 319, 342). Multiple times each day he: hangs upside down on an inversion table; does rubber band therapy; does light therapy; rides a stationary bike; takes hot baths; and applies hot and cold packs. (*Id.*). He also uses light weights and a universal weight machine, and meditates and prays one to two hours a day. (Tr. 316). He listens to relaxation and therapy tapes. (*Id.*). He attends individual and group therapy meetings or sessions. (Tr. 315). He gets massage therapy and acupuncture. (Tr. 316). In addition, he spends time with his doctors, therapists, and his mother. (Tr. 319).

Gier reads newspapers and the mail, eats independently, and watches television. (Tr. 316, 319). He can drive and goes outside every few days. (Tr. 318). He does not need to be accompanied when he leaves his house,[10] and he does not need reminders to go places. (Tr. 318-19). He can handle money and goes to stores to pick up his medications; he otherwise shops for gifts, supplements, and medications by phone and mail. (*Id.*). The April 24, 2008 Field Office Disability Report indicates that he had no problems hearing, reading, understanding, concentrating, talking, answering questions, sitting, standing, walking, seeing, using his hands, or writing. (Tr. 295).

As to social functioning, although Gier indicated in his Function Report that he is "pretty isolated" and doesn't socialize anymore because he has problems getting along with others, he

---

[10] In a different section of his Function Report regarding social activities, Gier was asked if he needs someone to accompany him. (Tr. 319). He responded: "At times." (*Id.*).

also indicated that he has never been fired or laid off because of difficulties with social interactions. (Tr. 319-21). He spends time with his mother, his doctors, and group or individual therapists. (Tr. 319). He is able to talk on the phone to place orders. (Tr. 318). The April 24, 2008 Field Office Disability Report indicates that during a face-to-face interview Gier was "dressed and groomed appropriately" and "was polite and answered questions easily." (Tr. 295).

With respect to concentration, persistence, and pace, while Gier stated in his Function Report that his attention span varies because he is easily distracted, that he does not finish what he starts, and that he can only follow spoken instructions "[i]f they're easy and simple," (Tr. 320), he filled out the eight-page Function Report thoroughly and even added an additional page to continue detailing his activities of daily living – including his complex schedule of exercises and therapies. (Tr. 314-22). He indicated that he does not need any special reminders to take care of his personal needs and grooming. (Tr. 317). He is able to drive, shop by phone and mail, and handle money. (Tr. 318). He reads, prays, and meditates daily. (Tr. 319). In addition, on March 18, 2008, Dr. Thomas J. Kaniowski, M.D., opined that Gier was alert and oriented times three, in no acute distress, and had a normal mood. (Tr. 462). Moreover, during his Field Office interview, Gier demonstrated no difficulty with hearing, reading, understanding, coherency, concentrating, talking, or answering questions; the interviewer described Gier as "polite" and able to answer questions "easily." (Tr. 295).

In his motion, Gier points to evidence that he believes supports the severity of his mental impairments. (Doc. #18 at 23-24). But he does not cite to any records from the relevant August 19, 2007 through December 31, 2008 time frame. (*Id.*). Instead, he cites to the Court's July 29, 2014 R&R and to the April 4, 2004 findings of Sharon Ridella-Mehlos, Ph.D. (*Id.*) (citing Tr. 512-14, 695). The problem for Gier is that Dr. Ridella-Mehlos' findings predate – by more than

three years – the period in question and therefore are not necessarily an accurate reflection of Gier's impairments during that time.  (Tr. 512-14).  *See e.g., Beasley v. Comm'r of Soc. Sec.*, No. 14-14386, 2016 WL 1084680, at *3 (E.D. Mich. Mar. 21, 2016); *Leveque v. Colvin*, No. 14-12096, 2015 WL 5612016, at *4 (E.D. Mich. Sept. 23, 2015).  Still, the ALJ did not ignore Dr. Ridella-Mehlos' opinion completely.  ALJ Sasena's finding of severe mental impairments was based, in part, on Dr. Ridella-Mehlos' assessment of Gier (Tr. 66), and thus by adopting ALJ Sasena's finding, the ALJ took Dr. Ridella-Mehlos opinion into account.

For the reasons explained above, substantial evidence supports the ALJ's finding that Gier's mental impairments caused mild functional limitations.

        2.     *Substantial Evidence Supports the ALJ's RFC Determination of Light Work*

This brings the analysis to Step Four, where the ALJ wrote:

> As [Gier] received no treatment for his mental health issues during the period of adjudication for this decision, outside of a continued prescriptions [sic] from Dr. Kaniowski for Valium, the undersigned finds that there is no new and additional evidence or changed circumstances that provided a basis for a different finding of [Gier's] mental [RFC] (*Drummond*; AR 98-4(6)). For this reason, there is no specific mental limitation that corresponds to the severe mental impairments, consistent with the "mild" findings at Step 3.

(Tr. 626).

Gier challenges this aspect of the decision, arguing that the ALJ erred by not including mental (e.g., concentration, persistence, and pace) limitations in his RFC and by limiting him to light work rather than sedentary work with a sit/stand option.[11]  (Doc. #18 at 23-24, 26-27, 29,

---

[11] The ALJ properly recognized that under Acquiescence Ruling 98-4, she was bound to ALJ Sasena's previous RFC determination of light work with additional limitations.  (Tr. 66). However, as to Gier's physical limitations, she found that there was evidence in the record showing

> that there has been a change in [Gier's] condition since the prior decision

31).  These arguments lack merit.

### a. Mental Limitations

The Court first addresses the ALJ's decision not to include a "specific mental limitation" in Gier's RFC.  (Tr. 626).  In arguing that his mental conditions caused more than mild difficulties, Gier points out that Judge Roberts concluded that there was "no evidence to support a finding that [his] mental condition had substantially improved."  (Doc. #18 at 23, 29) (citing Tr. 684-85).  To illustrate the severity of his mental condition, Gier recounts that Elizabeth Leon, LMSW, ACSW, opined that he continued to struggle with depression.[12]  (Id.) (citing Tr. 533).

In response, the Commissioner argues that Judge Roberts' finding regarding evidence of improvement in Gier's condition "only related to the question of whether [his] mental impairment had improved so as to justify a change from ALJ Sasena's finding that [Gier's] mental impairment was severe."  (Doc. #22 at 24).  In the Commissioner's view, the ALJ at Step Four properly considered "the combined effect of all of [Gier's] impairments on his ability to work," as she had been required to do on remand.  (Id. at 25) (citing Tr. 688).  The Commissioner argues that a review of the ALJ's decision shows that she evaluated evidence and testimony regarding Gier's mental impairments.  (Id.).  Thus, the ALJ "indeed considered whether [Gier] suffered mental impairment affecting his ability to work, finding that there was

_____

and that the substantial evidence of record supports the aforementioned [RFC].  Specifically, new evidence and [Gier's] complaints regarding hip issues, degenerative joint disease, degenerative disc disease, and rotator cuff tear supports the change in the [RFC] to the point where a more restricted light [RFC] was necessary for the period of August 19, 2007, through December 31, 2008.

(Tr. 623).

[12] As with his first argument, Gier also relies on the opinions offered by Dr. Ridella-Mehlos.  Again, though, those opinions – issued on April 4, 2004 – significantly pre-date the period in question and were taken into account by ALJ Sasena, whose findings the ALJ adopted.

no specific mental limitation corresponding to his mental impairment." (*Id.*) (citing Tr. 626).

The ALJ properly evaluated the evidence in the record as to Gier's mental conditions in determining that *res judicata* applied because she found that there was "no new and additional evidence or changed circumstances that provided a basis for a different finding of the claimant's mental [RFC]," and as a result, she was bound by *Drummond* and Acquiescence Ruling 98-4(6) to adopt ALJ Sasena's previous RFC, which contained no specific mental limitations.[13]   (Tr. 626).

First, the ALJ considered that Gier received no mental health treatment between August 19, 2007 and December 31, 2008 – except for a continued Valium prescription from Dr. Kaniowski, and that Dr. Kaniowski's treatment notes from this time frame "do not reference any clinical mental abnormalities, only noting that Valium helped him with his anxiety." (*Id.*).  Gier makes no substantive challenge to these findings, and indeed, Dr. Kaniowski's medical records from 2008 support this aspect of the RFC.  A March 18, 2008 treatment note indicates that Gier saw Dr. Kaniowski for a follow-up appointment after not having seen the doctor in three years. (Tr. 462).  Dr. Kaniowski opined that Gier was alert and oriented times three with normal mood, well-developed, well-nourished, and in no distress.  (*Id.*).  He opined that Gier's use of Valium on an as-needed basis "does help him with his anxiety."  (*Id.*).  The ALJ therefore did not err in finding this evidence to be inconsistent with a *May 12, 2015* Mental RFC Assessment prepared by Dr. Kaniowski in which he simply checked boxes indicating that "from December 31, 2008 and before to [the] present" Gier had very significant mental limitations, including moderate limitations in his ability to remember locations and work-like procedures; understand, remember,

---

[13] ALJ Sasena's August 18, 2007 RFC provides that Gier could perform light work except being unable to lift more than twenty pounds occasionally and ten pounds frequently; occasionally being able to climb, balance, stoop, kneel, crouch, and crawl, and no work at unprotected heights and with moving machinery.  (Tr. 66).

and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; interact appropriately with the general public; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation, and marked limitations in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.  (Tr. 941-42).

The ALJ appropriately gave little weight to Dr. Kaniowski's Mental RFC Assessment. The ALJ can appropriately give "less weight" to a medical opinion where a physician simply checks boxes and does not supply a narrative explanation for the basis of the opinion.  *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.'") (internal citations omitted).  Furthermore, "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) (citing *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264 n.6 (6th Cir. 1988)).  Here, Dr. Kaniowski filled out the Mental RFC Assessment on behalf of Gier by simply checking boxes seven years after his insured status had

24

expired.  (Tr. 941-44).  Dr. Kaniowski did not include a narrative or explanation for his answers, either handwritten directly on the form or as an attachment.  (*Id.*).  And, even if he had, Dr. Kaniowski's answers are not consistent with his March 2008 treatment note, which references no limitations of this kind.  Thus, Dr. Kaniowski's own notes from the relevant time frame at issue do not provide objective medical evidence to support the extreme limitations he assessed many years later with respect to Gier's generalized anxiety disorder and adjustment disorder.

Dr. Kaniowski's Mental RFC Assessment is also at odds with other evidence in the record, such as Gier's activities of daily living.  *See supra* at 18-20.  The ALJ appropriately noted these inconsistencies in giving this Mental RFC Assessment little weight.  (Tr. 626).

The ALJ also considered a letter dated January 20, 2010 from Leon, indicating that Gier received group and individual mental health services from her between September 2006 and February 2007.  (Tr. 627).  The ALJ specifically noted Leon's assertion that she had "no reason" to doubt that Gier "continues to struggle in dealing with depression and the discouragement that comes with his condition."  (*Id.*).  Ultimately, the ALJ gave Leon's opinion little weight because she found that it was not supported by the evidence in the record, it gave no indication of how Gier's depression would functionally affect him in a work environment, and there was no evidence that Leon treated Gier *during the time period at issue.*  (*Id.*).  Furthermore, the ALJ appropriately noted that Leon was not an acceptable medical source, so Leon could not give a medical opinion as to Gier's condition.[14]  (*Id.*); 20 C.F.R. §404.1513(a); *Soc. Sec. Rul. 06-03p*, 2006 WL 2329939, at *2 (Aug. 9, 2006).

---

[14]  Pursuant to 20 C.F.R. §404.1513(a), acceptable medical sources to establish whether a claimant has a medically determinable impairment include:  licensed physicians (medical or osteopathic doctors); licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists.  Only these "acceptable medical sources" can be treating sources under the "treating physician" rule.  *Soc. Sec. Rul. 06-03p*, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Other evidence supports the RFC not including a specific concentration, persistence, and pace limitation. During an in-person interview on April 24, 2008 – which was during the relevant period – Gier was polite, answered questions easily, and exhibited no difficulty with hearing, understanding, coherency, concentrating, and talking. (Tr. 295). On May 9, 2008, Elizabeth W. Edmond, M.D., conducted an examination of Gier for the Disability Determination Service. (Tr. 475-477). Although Dr. Edmond's letter mentions Gier's self-report of depression and "an overdose in September 2006," for which he "was not hospitalized," her "clinical impressions" report only physical impairments. (*Id.*).

Gier's argument regarding the severity of his mental conditions – and their alleged lack of improvement – is largely a credibility argument. (Doc. #28 at 23-24, 30). In arguing that his medical condition did not improve, but rather, "deteriorated after September 2007 and became disabling prior to [December 31, 2008]," Gier points to objective evidence such as X-rays "that demonstrate the existence of [a] medical condition that could reasonably give rise to [his] complaints of pain and limitations." (*Id.* at 30). Gier argues that an individual may be found disabled based entirely on the issue of pain, for which no objective evidence "of the pain itself" is required. (*Id.*).

The Sixth Circuit has held that determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical

26

reports and other evidence in the record.  *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible.  *Soc. Sec. Rul. 96-7*, 1996 WL 374186, *1 (July 2, 1996); *see also* 20 C.F.R. §404.1529.

The ALJ found upon reviewing the entire case record that Gier's activities of daily living and his failure to seek examination and treatment for his conditions during the relevant period reflected negatively on his credibility.  (Tr. 628).  As to Gier's activities of daily living, the ALJ noted that in numerous sources (e.g., application and appeal forms, medical reports or records, and Gier's prior testimony) he reported taking care of his personal needs, doing exercises where he lifted fifteen-pound weights, riding a stationary bike one to three times a day, reheating prepared meals, washing dishes, shopping by phone or mail, using the computer, driving, riding in a car, reading, watching television, praying, meditating, spending time with his mother, and being able to pay bills, count change, handle a savings account, and use a checkbook or money order.  (Tr. 627).  The ALJ appropriately concluded that these activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations, and required functioning within or beyond the limited range of light work identified."  (*Id.*).

With respect to his lack of medical treatment in the record, the ALJ found that "the record reveals relatively infrequent trips to the doctor" and no visits to the emergency room or free care clinics "for the allegedly disabling symptoms during the period at issue in this

decision." (*Id.*).  According to the ALJ, Gier only had three appointments with Dr. Kaniowski during this time frame.  (*Id.*).  When Gier saw Dr. Kaniowski on March 18, 2008, it was his first visit in three years; his next visit ten days later focused on his lipid levels, which has nothing to do with his claimed disability; and his visit after that was for a prescription renewal.  (*Id.*) (citing Tr. 462, 524, 526).  The ALJ concluded that, in fact, "[t]here [was] no evidence of further treatment from August 19, 2007 through December 31, 2008, outside of . . . lumbar spine x-rays" and that Gier's regular treatment for physical issues began only after April 2011, well beyond his date last insured, when he fell and tore his rotator cuff.  (*Id.*).  The ALJ found that this lack of treatment was at odds with the "reasonable expectation" that a claimant who alleges a condition severe enough to be disabling will seek examination and treatment for it.  (Tr. 627-28).  Accordingly, the Court finds that the ALJ's credibility assessment is supported by substantial evidence, and Gier has shown no "compelling reason" to reject it.

For the foregoing reasons, substantial evidence supports the ALJ's mental RFC determination.

### b.  *Physical Limitations*

Gier also argues that the physical limitations imposed by Dr. Kaniowski and Dr. Edmond do not support an RFC for light work.  (Doc. #18 at 26-27).  Gier points out that his March 18, 2008 X-ray results showed moderate degenerative changes to moderately severe degenerative changes in the lower thoracic and proximal lumbar spine with milder degenerative changes in his mid and lower lumbar spine.  (*Id.* at 25; Tr. 458).  He also complained on that date to Dr. Kaniowski of lower back pain, and Dr. Kaniowski indicated that Gier had to elevate his legs and limited Gier to walking half a block, sitting for thirty minutes, and standing for ten minutes. (Doc. #18 at 25; Tr. 529-30).  Similarly, Gier recites Dr. Edmond's notes that he complained of

knee, neck, back, and hip pain; his left leg is one and a half inches shorter than his right; he had restricted range of motion in his cervical spine and left hip; he had crepitation on range of motion of both knees; his deep tendon reflexes in his lower extremities were unobtainable; and he had an abnormal gait.  (Doc. #18 at 26).  Gier also notes that Dr. Edmond "recommended" that he use a cane in his right hand for distance and prolonged walking to help him balance and put less weight on his left hip.  (*Id.*).

Dr. Kaniowski's answers to a Physical RFC Questionnaire imposed significantly greater restrictions.[15]  (Tr. 528-32).  Dr. Kaniowski opined, for instance, that Gier's pain and other symptoms are severe enough to frequently interfere with the attention and concentration needed to perform even simple work tasks; he is incapable of even "low stress" jobs[16]; he can walk half a block without rest or severe pain; he can sit for thirty minutes at one time; and he can stand for ten minutes at one time.  (Tr. 529).  Dr. Kaniowski also opined that in an eight-hour workday, Gier can sit and stand/walk for less than two hours and that every five minutes, he must walk for five minutes; he needs a job that allows him to shift from sitting, standing, or walking "at will"; he will sometimes need to take unscheduled breaks; he needs to elevate his legs above his hips when sitting for prolonged periods; and he needs a cane or other assistive device when

---

[15]  The Physical RFC Questionnaire was filled out on January 13, 2010, but Dr. Kaniowski affirmed that it was his opinion that "the description of symptoms and limitations in this questionnaire apply continuously from December 31, 2008 and before to [the] present."  (Tr. 532).

[16]  Statements by a treating physician that a claimant is unable to work "are entitled to no deference because the determination of disability is a matter left to the Commissioner."  *See Stojic v. Comm'r of Soc. Sec.*, No. 14-1133, 2015 WL 9238986, at *4 (W.D. Mich. Dec. 17, 2015) ("[S]tatements that a claimant suffers from unspecified limitations or is disabled or unable to work, as here, are entitled to no deference because the determination of disability is a matter left to the Commissioner.") (citing 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled.")).

occasionally standing or walking.  (Tr. 529-30).

The ALJ did not err in her handling of either Dr. Kaniowski's or Dr. Edmond's opinions as substantial evidence supports an RFC for light work,[17] as well as her decision to give little weight to Dr. Kaniowski's opinions – which she found were inconsistent with the evidence in the record – while giving great weight to Dr. Edmond's opinion[18] – which she found to be consistent with that evidence.  (Tr. 625).

An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakley*, 581 F.3d at 406 (internal quotations omitted).  However, it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  *Soc. Sec. Rul. 96-2p*, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").  If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion

---

[17] As the Commissioner points out, since substantial evidence supports the RFC for light work, Gier's argument regarding the application of Grid Rule 201.14 fails; this rule applies only to an RFC for sedentary work.  (Doc. #18 at 28; Doc. #22 at 22 n.10; Doc. #24 at 4); 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[18] The ALJ incorporated many of the restrictions imposed by Dr. Edmond into the RFC.  (Tr. 623-25).  In particular, she limited Gier to pushing or pulling when seated only; prohibited him from climbing ladders, ropes, or scaffolds; and required Gier to use a handheld assistive device for uneven terrain or prolonged ambulation.  (Tr. 623).

with the record as a whole, and the specialization of the treating source."[19]  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. §404.1527(c)(2) (ALJ must "give good reasons" for weight given to treating source opinion)).   Among these considerations, inconsistency with the evidence in the record is a "sufficiently valid reason not to accept the opinions of a treating medical doctor."  *Walters*, 127 F.3d at 530 (citing *Bogle v. Sullivan,* 998 F.2d 342, 347-48 (6th Cir. 1993) and *Cutlip,* 25 F.3d at 287) (finding that where a claimant's impairments "of disabling severity [are] not . . . supported by detailed, clinical, diagnostic evidence . . . the Commissioner 'is not bound by the treating physician's opinions, and . . . such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence'").

Again, the evidence supports the ALJ's handling of the physicians' opinions.  While the ALJ focused largely on inconsistencies between the record evidence and the extreme limitations contained in Dr. Kaniowski's Physical RFC Questionnaire – an issue discussed in detail below – the ALJ also noted that she was giving little weight to Dr. Kaniowski's opinion because "during the period of adjudication in this decision, which represents a period of a little more than 16

---

[19] While the ALJ focused largely on inconsistencies between the record evidence and the extreme limitations contained in Dr. Kaniowski's Physical RFC Questionnaire – an issue discussed in detail below – the ALJ also noted that she was giving little weight to Dr. Kaniowski's opinion because "during the period of adjudication in this decision, which represents a period of a little more than 16 months, there is evidence of, at most, three visits to Dr. Kaniowski by [Gier], and his March 18, 2008, visit was his first in about three years."  (Tr. 626).  The ALJ noted that "the record reflects that [Gier] did not begin regular treatment for physical issues until April 2011, when he fell . . . however, this was well after the date last insured."  (Tr. 627).  The ALJ also noted that "there is no evidence of any emergency room visits or visits to a free care clinic during this period."  (Tr. 626).  The ALJ thus concluded that the "lack of treatment conflicts with the severely disabling limitations suggested by Dr. Kaniowski."  (*Id.*).  The ALJ also noted that Dr. Kaniowski "did not prescribe any pain medication to [Gier] during the period at issue" and that Gier had testified in 2007 that he was "only using Aleve and ibuprofen for his pain."  (*Id.*).  These are all valid considerations by the ALJ for the weight given to Dr. Kaniowski's opinion.

months, there is evidence of, at most, three visits to Dr. Kaniowski by [Gier], and his March 18, 2008, visit was his first in about three years." (Tr. 626). The ALJ noted that "the record reflects that [Gier] did not begin regular treatment for physical issues until April 2011, when he fell . . . however, this was well after the date last insured." (Tr. 627). The ALJ also noted that "there is no evidence of any emergency room visits or visits to a free care clinic during this period." (Tr. 626). The ALJ thus concluded that the "lack of treatment conflicts with the severely disabling limitations suggested by Dr. Kaniowski." (*Id.*). The ALJ also noted that Dr. Kaniowski "did not prescribe any pain medication to [Gier] during the period at issue" and that Gier had testified in 2007 that he was "only using Aleve and ibuprofen for his pain." (*Id.*). These are all valid considerations by the ALJ for the weight given to Dr. Kaniowski's opinion.

Turning to the evidence, the ALJ discussed Dr. Kaniowski's treatment notes from March 18, 2008, when Gier presented (for the first time in three years) with complaints that he was having "some difficulty" with his lower back. (Tr. 624, 627). X-rays showed "moderate to moderately-severe degenerative changes about the lower thoracic and proximal lumbar spine" and "considerable narrowing of L1-L2," however, Gier reported to Dr. Kaniowski that he exercised frequently and reported no lightheadedness, dizziness, or headaches; no chest pain or shortness of breath; no nausea, vomiting, diarrhea, or dyspepsia; and no muscle or leg cramps. (Tr. 462, 624-25). Dr. Kaniowski opined that Gier was alert and oriented times three with normal mood and was well-developed, well-nourished, and in no distress. (*Id.*). Gier's extremities were free of edema and he had no calf tenderness; his sensory function to touch and motor strength were equal bilaterally; and his cranial nerves II through XII were intact. (*Id.*). Dr. Kaniowski also noted that Gier was using Valium on an as-needed basis and "that does help him with his anxiety." (*Id.*). Ultimately, he assessed Gier with "[s]ome underlying arthritis of

his lower spine from his previous injury," among other findings – none of which resulted in instructions to use an assistive device or to restrict his movement. (*Id.*).

When Dr. Edmond saw Gier on May 9, 2008, she did note that his left leg was shorter than his right and that he reported pain in both hips, in addition to his neck, spine, shoulders, and knees. (Tr. 475). But she also noted that he didn't have a limp when he walked with his shoes on and used an orthotic in his left shoe; his gait had a normal heel-toe sequence; he could stand on his heels, toes, and tandem walk; he could dress and undress himself independently; he could get on and off the examination table independently; he could bend and stoop; he could push and pull when sitting; and his straight leg raising test was negative. (Tr. 476-79). She recorded that he could climb stairs one step at a time and using a railing. (Tr. 478). Although she found that he had restricted range of motion in his cervical spine, she found no evidence of kyphosis or scoliosis; no spasm; no crepitation, arythema, or increased warmth; slight limitation in his shoulders' range of motion; and full range of motion in his elbows. (Tr. 476, 480). He also had full range of motion in his wrists and fingers of both hands, with bilateral grip strength up to thirty kilograms. (Tr. 476, 481). As a result, she concluded that "[a]s it relates to fine and gross dexterity, he can open a jar, button, write legibly, tie his shoes and pick up a coin," and that he could dial a telephone, open a door, make a fist, and pick up a pencil. (Tr. 477-78).

Dr. Edmond noted that Gier had decreased range of motion in his left hip but full range of motion in his right hip, which allowed him to do heel-shin testing on the right (it was limited on the left); full range of motion in both knees with crepitation; no cruciate, medial, or lateral ligament instability; no increased warmth; and full range of motion in his ankles. (Tr. 476-77, 481). She noted that his deep tendon reflexes in his upper extremities were 1+; his individual muscle testing was "Good to Normal," excluding his left hip girdle muscles; his sensory

33

perception was intact; and his coordination was intact based on finger-finger, finger-nose, and rapid hand movements.  (Tr. 476, 478).  She found no fasciculations; that his peripheral pulses were equal bilaterally; and no ataxia, tremor, spasticity, or increased tone.  (Tr. 476).  In her concluding remarks, Dr. Edmond opined that "[f]or distance, uneven ground or prolonged walking, the use of a cane in one hand, particularly the right hand, may be considered to help with balance and decrease some of the weight being borne through the left hip."  (Tr. 477, 479).  Notably, she said only that the use of a cane "may be considered" – not that it was recommended or required.  (*Id.*).

Again, the foregoing constitutes substantial evidence supporting the weight the ALJ gave to the opinions of Dr. Kaniowski and Dr. Edmond, as well as the light work RFC she ultimately adopted.  *Walters*, 127 F.3d at 531 (6th Cir. 1997) (rejecting the claimant's argument that the ALJ "was required to accord any more deference" to a treating physician's opinion beyond simply considering his opinion and weighing it along with all other evidence in the record).  Thus, the ALJ's analysis of Dr. Kaniowski and Dr. Edmond's medical opinions was proper.

The May 22, 2008 findings of Medical Consultant Susan Shaughnessy provide additional support for the ALJ's RFC determination.  (Tr. 482-89).  As to Gier's exertional limitations, Dr. Shaughnessy opined that he could occasionally lift and/or carry up to twenty pounds; frequently lift and/or carry up to ten pounds; stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday; sit with normal breaks for a total of about six hours in an eight hour workday; and push and/or pull with no limitations, including operating hand and/or foot controls.  (Tr. 483).  As for postural limitations, she opined that he could frequently stop and crouch; occasionally climb ramps or stairs, balance, kneel, and crawl; and never climb ladders, ropes, or scaffolds.  (Tr. 484).  Further, she opined that he had no established manipulative,

visual, communicative, and environmental limitations.  (Tr. 485-86).  Ultimately, she found that the medical evidence in the record did not support the severity of Gier's allegations.  (Tr. 487).

Gier argues that the ALJ "improperly discounted" his April 7, 2010 hearing testimony in formulating the RFC.  (Doc. #18 at 25).  He also argues that giving it less weight because it was over sixteen months after his date last insured "is not a valid reason to discount testimony." (*Id.*).  But the Sixth Circuit has held that "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong*, 88 F. App'x at 845 (citing *Cornette*, 869 F.2d at 264 n.6).  Moreover, while 20 C.F.R. § 404.1545 provides that an RFC is assessed "based on all the relevant evidence in [a claimant's] case record," including statements provided by the claimant, it does not specify or require that any particular weight be given to a claimant's hearing testimony.  20 C.F.R. § 404.1545(a)(1), (3).

Here, the ALJ considered Gier's hearing testimony from both March 22, 2007 and April 7, 2010.  (Tr. 624).  The ALJ attributed less weight to his 2010 testimony – without discarding it completely – because it was given over sixteen months after his date last insured.  (*Id.*). Meanwhile, Gier's 2007 testimony was given before his date last insured.  (*Id.*).  The ALJ was not required to give both of these hearing testimonies equal weight; that the later testimony was from over sixteen months after the date last insured was a valid reason for the ALJ to give it less weight.  *Strong*, 88 F. App'x at 845.

In addition to medical records and Gier's hearing testimony, the ALJ also appropriately considered Gier's activities of daily living prior to his date last insured in formulating the RFC. The ALJ noted that Gier reported taking care of his personal needs, doing exercises that involved lifting fifteen-pound weights, riding a stationary bike one to three times a day, reheating prepared meals, washing dishes, shopping by phone or mail, using the computer, driving, riding in a car,

reading, watching television, praying, meditating, spending time with his mother, and handling money. (Tr. 627). The ALJ concluded that these activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations, and required functioning within or beyond the limited range of light work identified." (*Id.*). Thus, the ALJ sufficiently discussed (in approximately five pages, single spaced) and appropriately considered the evidence in the record to support her RFC determination for light work. (Tr. 623-28).

Finally, Gier argues that "it is not clear whether [he] required the use of a cane while standing for balance." (Doc. #18 at 25). But Gier highlights no clinical evidence or medical opinions indicating that he needed a cane to help him balance when standing.[20] On the contrary, on March 18, 2008, Dr. Kaniowski did not record that Gier was using a cane, nor did he prescribe him one. Instead, he noted that Gier exercises frequently; reported no muscle or leg cramps; had extremities free of edema and no calf tenderness; had equal bilateral sensory function to touch and motor strength; and had intact cranial nerves II through XII. (Tr. 462). On April 24, 2008, his initial application interviewer noted that Gier had no difficulties standing or walking. (Tr. 295). On May 9, 2008, Dr. Edmond noted that Gier walked without a limp when he used an orthotic in his left shoe. (Tr. 476). She also noted that he had a normal heel-toe sequence in his gait; could stand on his heels, toes, and tandem walk; could bend and stoop; and could climb stairs. (Tr. 476-79). While Dr. Edmond did opine that "***[f]or distance, uneven ground or prolonged walking***, the use of a cane in one hand, particularly the right hand, may be considered to help with balance and decrease some of the weight being borne through the left

---

[20] Gier's Function Report indicates that he can walk short distances and uses a medically-prescribed cane. (Tr. 320-21). And in his motion, he argues that he should be limited to sedentary work because he "had a total hip replacement and uses a cane." (Doc. #18 at 27). But he does not support these statements with medical records or objective findings. As explained above, there is no indication that the use of a cane while standing was medically required.

hip," she did not indicate that he required one for those purposes, let alone while merely standing. (Tr. 477, 479) (emphasis added). Similarly, on May 22, 2008, Medical Consultant Susan Shaughnessy found that Gier could stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday with no mention of an assistive device. (Tr. 483). As the Commissioner points out, despite this, the ALJ's RFC limitation that Gier not sit or stand for more than twenty minutes at one time adequately "acknowledges any difficulty that [Gier] may have with standing for long periods." (Doc. #22 at 18) (citing Tr. 623). Thus, the ALJ's RFC determination that Gier can perform light work is supported by substantial evidence.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [22] be GRANTED, Gier's Motion for Summary Judgment [18] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: January 12, 2017                            s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                                               United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v.*

*Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 12, 2017.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
